UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| BROOKS LECATES,<br><br>                    Plaintiff,<br><br>v.<br><br>BLUE CROSS OF IDAHO, a corporation licensed to do business in the state of Idaho,<br><br>                    Defendants. | Case No. 3:15-cv-00072-CWD<br><br>**MEMORANDUM DECISION AND ORDER** |

**INTRODUCTION**

Before the Court are cross motions for summary judgment filed by Plaintiff Brooks LeCates and Defendant Blue Cross of Idaho, as well as Blue Cross's evidentiary motion asking the Court to strike the affidavits LeCates submitted in opposition to Blue Cross's motion for summary judgment. (Dkt. 16, 22, 23.) The motions are fully briefed, and the Court heard oral argument from the parties on August 29, 2016.

LeCates seeks payment of benefits due under his health insurance plan for hospitalization and medical treatment he received for injuries sustained in a motorcycle accident. Blue Cross contends LeCates failed to exhaust his administrative remedies

under the terms of the Plan, and for that reason, argues the Complaint should be dismissed with prejudice. LeCates contends he exhausted all required administrative remedies, or alternatively, that further pursuit of such remedies would have been futile. As to the merits, Blue Cross and LeCates differ over the interpretation of the "illegal act exclusion" Blue Cross applied and upon which it based its denial of benefits determination.

After carefully considering the parties' written memoranda, relevant case law, and the parties' arguments, the Court will grant Blue Cross's motion to strike; deny Blue Cross's motion for summary judgment; and grant LeCates's motion for summary judgment.

## FACTS[1]

### 1.      Plan Terms

LeCates is an eligible dependent of an enrollee in a group health plan sponsored by Gritman Medical Center ("Gritman"). That group plan, titled "ASC Preferred Blue Master Group Plan," was effective January 1, 2014, through December 31, 2014. (Dkt. 16-7 at 35 –112.)[2] It is subject to the Employee Retirement Income Security Act (ERISA), 29 U.S.C. §§ 1001, *et seq.  See* Compl. ¶ 3.

Gritman is identified as the Plan Administrator, and benefits under the Plan are paid by Gritman. (Dkt. 16-7 at 85.) According to the Plan, Gritman is the "sole fiduciary of the Plan, [and] has all discretionary authority to interpret the provisions and control the

---

[1] The facts are taken from the administrative record submitted by Blue Cross. (Dkt. 16.)
[2] The Administrative Record contains several duplicate copies of the Plan. The most legible copy is cited.

**MEMORANDUM DECISION AND ORDER  - 2**

operation and administration of the Plan…. All decisions made by the Plan Administrator…shall be final and binding on all parties."

Blue Cross is defined as a nonprofit mutual insurance company, hired by Gritman, to act as the third party Contract Administrator to perform claims processing and other administrative services as outlined in the Plan. (Dkt. 16-7 at 78.) The Plan states that Blue Cross, as the Contract Administrator, is "not an insurer of health benefits under this Plan, is not a fiduciary of the Plan and does not exercise any of the discretionary authority and responsibility granted to the Plan Administrator. The Contract Administrator is not responsible for Plan financing and does not guarantee the availability of benefits under this Plan." *Id.*

The Plan provides for various benefits but also contains certain exclusions in the "Exclusions and Limitations Section." (Dkt. 16-7 at 90 – 16-7 at 94.) Specifically, the Plan states:

> A. General Exclusions and Limitations
> There are no benefits for services, supplies, drugs or other charges that are:
> ****
> AL. For the treatment of injuries sustained while committing a felony, voluntarily taking part in a riot, or *while engaging in an illegal act* or occupation, unless such injuries are the result of a medical condition or domestic violence.

(Dkt. 16-7 at 92.) (emphasis added).

Under the terms of the Plan, Blue Cross was responsible for processing claims for benefits in accordance with the Administrative Services Agreement between Blue Cross and Gritman. (Dkt. 16-7 at 96.) In addition, Blue Cross was vested with authority and

**MEMORANDUM DECISION AND ORDER  - 3**

discretion to determine eligibility for coverage under the terms of the Plan, and to determine the amount of benefits owed on covered claims. (Dkt. 16-7 at 109.)

The Plan contains a section outlining the inquiry and appeals procedures in Section XV. (Dkt. 16-7 at 102.) Participants who wish to formally appeal a post-service claim decision by Blue Cross, who acts on behalf of the Plan Administrator, may do so through the following process:

> 1. A written appeal *must* be sent to the Appeals and Grievance Coordinator within one hundred eighty (180) days after receipt of notice of Adverse Benefit Determination. This written appeal should set forth the reasons why the Participant contends BCI's decision was incorrect. Any written comments, documents or other relevant information may be submitted with the appeal.

> 2. After receipt of the written appeal, all facts, including those originally used in making the initial decision and any additional information that is sent or that is otherwise relevant, will be reviewed by a BCI Medical Director, or physician designee if the appeal requires medical judgment. *BCI shall mail a written reply to the Participant within thirty (30) days after receipt of the written appeal. If the original decision is upheld, the reply will list the specific reasons for denial and the specific provisions on which the decision is based.*
> ****
> 4. If the original decision is upheld upon reconsideration, the Participant *may* send an additional written appeal to the Appeals and Grievance Coordinator requesting further review. This appeal must set forth the reasons for requesting additional reconsideration and must be sent within sixty (60) days of BCI's mailing of the initial reconsideration decision. A BCI Medical Director who is not subordinate to the Medical Director or physician designee who decided the initial appeal, will issue a final decision after consideration of all relevant information, if the appeal requires medical judgment. A final decision on the appeal will be made within thirty (30) days of its receipt. If the appeal does not require medical judgment, a BCI Vice President who did not decide the initial appeal will issue the decision.

(Dkt. 16-7 at 103.) (Emphasis added.) "A Participant must first exhaust BCI's internal grievance and appeal process. Exhaustion of that process includes completing all levels of appeal." (Dkt. 16-7 at 104.)

Elsewhere, the Plan outlines the appeals process in plain language in the section titled, "Rights of Plan Participants." (Dkt. 16-7 at 111.) In that section, the Plan states that, if a claim for benefits is denied, "you will receive a written explanation of the reason for the denial. If you do not agree with the denial, you have the right to ask the Plan Administrator to review the claim. If you are not satisfied with the result of such a review, you may file suit in a state or federal court." (Dkt. 16-7 at 111.)

## 2.      The Accident and Claims Process

LeCates, a 22-year-old male, was injured on April 12, 2014, when he was riding his road bike (motorcycle), lost control, and hit a fence. (Dkt. 16-3 at 22.) According to the Accidental Injury Questionnaire LeCates completed, LeCates lost control of the motorcycle when he hit soft gravel on a corner while traveling on Highway 12 near Lenore, Idaho.[3]  (Dkt. 16-6 at 20.) He suffered serious injuries[4] and required extensive medical treatment at St. Joseph Regional Medical Center in Lewiston, Idaho. (Dkt. 16-3 at 22 – 24.) The treating physician's report indicates LeCates "does drink quite heavily." (Dkt. 16-3 at 24.) According to the laboratory report, tests taken at the time of his

---

[3] Hospital records indicate LeCates estimated his speed at the time of the accident was 70 miles per hour. (Dkt. 16-3 at 22.) LeCates disputes how fast he was travelling, and there is no other evidence of LeCates's speed other than in the hospital records. Also absent from the record is the speed limit applicable to the portion of the highway LeCates was traveling. Additionally, the Court notes that the hospital records indicate LeCates slowed the motorcycle to 40 miles per hour but still lost control. (Dkt. 16-4 at 4.)

[4] LeCates suffered a facet fracture at C6-7 on the right side, a chip fracture of C2 on the right side, and a 1x2 cm. epidural hematoma requiring a craniotomy. (Dkt. 16-3 at 25.)

**MEMORANDUM DECISION AND ORDER  - 5**

admission to the emergency room indicated a blood alcohol serum level of .104. (Dkt. 16-3 at 32.)[5]

Blue Cross initially paid benefits to medical care providers following LeCates's inquiry about why his providers' bills were going unpaid. But, on April 16, 2014, Blue Cross notified LeCates in writing that benefits for his inpatient stay at the hospital beginning April 12, 2014, were denied based upon the illegal act exclusion in the policy. (Dkt. 16-3 at 17.)

On or about May 26, 2014, LeCates received Explanation of Benefits statements denying $45,841.01 in medical charges submitted by St. Joseph Regional Medical Center. (Dkt. 16-3 at 42-43). In contrast to Blue Cross's April 16, 2014 letter, the EOB noted the reason for the denial was that the services were not medically necessary and not eligible for coverage.

On July 17, 2014, LeCates[6] submitted an appeal of the April 16, 2014 denial. (Dkt. 16-3 at 14.)  LeCates asserted Blue Cross did not review all available information, and could not have made a determination that LeCates's injuries were the result of an illegal act. LeCates did not submit additional documents nor did he identify what documents should have been reviewed.

On July 28, 2014, Blue Cross acknowledged receipt of LeCates's request for reconsideration of his claim for medical benefits. (Dkt. 16-3 at 11.) The letter requested a signed authorization form to allow LeCates's representative to appeal the claim decision

---

[5] LeCates disputes the accuracy of the test and the testing method used, but does not dispute that the laboratory test indicated a blood alcohol serum level of .104.
[6] LeCates had retained counsel, and counsel submitted the letter on his behalf.

on his behalf. LeCates submitted the authorization form on July 31, 2014. (Dkt. 16-3 at 10.) By letter dated August 7, 2014, Blue Cross informed LeCates it had received the appeal and the signed authorization form as of August 4, 2014, and that it was reviewing the appeal. Blue Cross indicated that, unless it needed additional information, a response would be sent within 30 days from the date it received the signed authorization form. (Dkt. 16-3 at 9.)

Blue Cross sent a second denial letter dated September 2, 2014, responding to LeCates's appeal requesting reconsideration of his claim for services from April 12, through April 16, 2014. (Dkt. 16-3 at 1-2.) Blue Cross indicated it was upholding its denial under the illegal act exclusion, stating as follows:

> Mr. LeCates' policy does not require that he be cited or found guilty in a court of law, only that he be engaged in an illegal act. Mr. LeCates' medical records provided by St. Joseph Regional Medical Center, included hospital admittance tests immediately following his single motorcycle crash. These medical records included a blood alcohol serum level of .104, which support that he was over the legal limit for alcohol at the time of the accident. It is illegal to drive while under the influence; therefore, he was engaged in an illegal act, under the terms of his policy.

(Dkt. 16-3 at 1-2.) Blue Cross indicated previously approved claims for medical services rendered were being adjusted and reversed. The letter further explained that, once the claims were adjusted, LeCates would receive a new EOB, that new appeal rights would become available, and that LeCates "may submit a second appeal requesting further review" within 180 days from the date of the new EOB. (Dkt. 16-3 at 2.)

A new EOB dated September 8, 2014, indicated additional claims previously approved were denied. (Dkt. 16-7 at 113 – 118.) According to the EOB, the appeal procedures involved writing a letter with supporting documentation contesting the denial of benefits. Upon receipt of a decision upholding the initial decision, the EOB explained the plan participant "may have the right to file a second appeal. An external review process may be available to you following completion of the internal review process. Under Section 502(a) of the Employment retirement Income Security Act, you may also have the right to file a civil action following the exhaustion of the complete appeals process." (Dkt. 16-7 at 118.)

LeCates did not file any further appeals, and instead filed a complaint in this Court on March 5, 2015. (Dkt. 1). On March 25, 2015, Blue Cross notified Gritman of the Complaint. (Dkt. 16-6 at 27.) In an email response dated April 6, 2015, Gritman indicated it had received the materials Blue Cross sent to it regarding the denial of benefits and that it agreed with Blue Cross's denial of LeCates's claims for benefits. (Dkt. 16-7 at 32.)

LeCates's suit against Blue Cross seeks benefits due under the Plan pursuant to Section 502(a)(1)(B) of ERISA (29 U.S.C. § 1132(a)(1)(B)), and for an award of any equitable remedies available under Section 502(a)(3) (29 U.S.C. § 1132(a)(3)).

## DISPOSITION

### 1.    Motion to Dismiss for Failure to Exhaust Administrative Remedies

Blue Cross asserts that, following receipt of the adverse benefit decision on April 16, 2014, the Plan required LeCates to file a written appeal. Blue Cross acknowledges LeCates did so on July 17, 2014. Blue Cross argues, however, the Plan required LeCates

MEMORANDUM DECISION AND ORDER  - 8

to file a second level appeal before he could file suit. In contrast, LeCates argues he exhausted his available administrative remedies, because he received not one, but two denial letters dated April 16, 2014, and September 2, 2014. LeCates argued at the hearing that a second level appeal, which would have been submitted after receipt of the September 2, 2014 denial letter, was discretionary based upon the interpretation of the Plan language. Alternatively, LeCates argues further appeals would have been futile, because the September 8, 2014 EOB proffered the same reason for denial of his claims as proffered in both the April 16 and September 2 letters, and he had no further information to submit.

### A.   *Legal Standard*

Although Blue Cross moves for summary judgment, the defense of "failure to exhaust nonjudicial remedies should be raised in a motion to dismiss, or be treated as such if raised in a motion for summary judgment." *Ritza v. Int'l Longshoremen's and Warehousemen's Union*, 837 F.2d 365, 368–69 (9th Cir. 1988), *overruled on other grounds in Albino v. Baca*, 747 F.3d 11162 (9th Cir. 2014). A defendant may raise the exhaustion defense early in the case, on an incomplete record, via an unenumerated Fed. R. Civ. P. 12(b) motion "as a matter of abatement." *Wyatt v. Terhune*, 315 F.3d 1108, 1119 (9th Cir. 2003); *Payne v. Peninsula School Dist*., 653 F.3d 863, 881 (9th Cir. 2011) (discussing unenumerated Rule 12(b) motions in context of IDEA).

To resolve a Rule 12(b) motion raising failure-to-exhaust issues, "the court may look beyond the pleadings and decide disputed issues of fact." *Wyatt*, 316 F.3d at 1119–20. In such instances, the court "has a broad discretion as to the method to be used in

resolving the factual dispute." *Ritza*, 837 F.2d at 369. However, the court "must assure that [the plaintiff] has [had] fair notice of his opportunity to develop the record." *Wyatt*, 315 F.3d at 1120, n. 14.

Distinguishing unenumerated Rule 12(b) motions from motions brought specifically under Rule 12(b)(6) and 56, *Ritza* further explained that "no presumptive truthfulness attaches to plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of [the] claims." *Ritza*, 837 F.2d at 369 (internal citations and punctuation omitted). Even so, because failure to exhaust is an affirmative defense, a defendant bears the burden of persuasion. *Wyatt*, 315 F.3d at 1119.

"ERISA itself does not require a participant or beneficiary to exhaust administrative remedies in order to bring an action under [section] 502 of ERISA, 29 U.S.C. § 1132." *Vaught v. Scottsdale Healthcare Corp. Health Plan*, 546 F.3d 620, 626 (9th Cir. 2008). However, based on both the text of ERISA and its legislative history, the Court of Appeals for the Ninth Circuit held that "federal courts have the authority to enforce the exhaustion requirement in suits under ERISA, and that as a matter of sound policy they should usually do so." *Amato v. Bernard*, 618 F.2d 559, 568 (9th Cir. 1980). The Ninth Circuit has consistently held that, before bringing suit under Section 502, an ERISA plaintiff claiming a denial of benefits "must avail himself or herself of a plan's own internal review procedures before bringing suit in federal court." *Diaz v. United Agric. Employee Welfare Benefit Plan & Trust*, 50 F.3d 1478, 1483 (9th Cir. 1995). *See*

**MEMORANDUM DECISION AND ORDER  - 10**

*also Hixon v. Hewitt Associates*, No. 1:12–cv–00489–EJL–REB, 2013 WL 2338111, at

*3 (D. Idaho May 28, 2013) (applying the exhaustion requirement in an ERISA case).

A plaintiff may be excused from the exhaustion requirement provided the plaintiff

provides support for the excuse. "[B]are assertions of futility are insufficient to bring a

claim within the futility exception, which is designed to avoid the need to pursue an

administrative review that is demonstrably doomed to fail." *Diaz*, 50 F.3d at 1485

(emphasis added). A plan's refusal to pay does not, by itself, show futility. *Foster v. Blue

Shield of Ca.*, 2009 WL 1586039, at *5 (C.D. Cal. June 3, 2009).

For example, in *Diaz*, the Ninth Circuit found insufficient the plaintiff's argument

that "defendants ha[d] demonstrated by their continued refusal to pay that they ha[d] no

intention of doing so." 50 F.3d at 1485-86. The court noted that the plaintiff's futility

argument was "really circular, for defendants' current denial is pegged entirely to

[Plaintiffs'] failure to have pursued the administrative route .... In this instance

[Plaintiffs'] own delinquency in pursuing an internal appeal prevented the possibility of

an administrative look at the merits, and the record contains nothing but speculation to

suggest that the administrators would have reached a preconceived result in that respect."

50 F.3d at 1485-86.

Courts generally require that a plaintiff asserting futility proffer facts and

circumstances indicating why administrative review would be futile. For example, in *A.F.

v. Providence Health Plan*, 2016 WL 81796 at *7 (D. Or. Jan. 7, 2016), the court

considered evidence of the insurer's policy refusing to pay for certain benefits prior to a

certain date; similarly situated plaintiffs who had been denied benefits after exhausting

**MEMORANDUM DECISION AND ORDER  - 11**

the appeals process; and testimony from the insurance company's representative that plaintiffs had exhausted their internal remedies as sufficient for establishing futility.

In addition to the futility exception, a second exception to the exhaustion requirement exists. The Courts of Appeal for the Eleventh, Seventh, and Second Circuits apply a narrow exception, exempting from the general exhaustion requirement those plan participants who "reasonably interpret" an ERISA plan not to require exhaustion and, as a result, fail to exhaust administrative remedies prior to filing suit in federal court. *Kirkendall v. Halliburton, Inc.*, 707 F.3d 173, 180 (2nd Cir. 2013). *See also Watts v. BellSouth Telecomms., Inc.*, 316 F.3d 1203, 1209–10 (11th Cir. 2003) ("If a plan claimant reasonably interprets the relevant statements in the summary plan description as permitting her to file a lawsuit without exhausting her administrative remedies, and as a result she fails to exhaust those remedies, she is not barred by the court-made exhaustion requirement from pursuing her claim in court."); *Gallegos v. Mount Sinai Med. Ctr.*, 210 F.3d 803, 810 (7th Cir. 2000) (same, on estoppel grounds).

The reasonableness of the plan participant's interpretation "must be judged from the perspective of the average plan participant." *Watts*, 316 F.3d at 1207 (citing 29 U.S.C. § 1022(a) "The summary plan description ... shall be written in a manner calculated to be understood by the average plan participant."); *cf. Lee v. Blue Cross/Blue Shield of Ala.*, 10 F.3d 1547, 1551 (11th Cir. 1994); (ambiguities in the summary plan description and plan construed against the drafter); *Bergt v. Ret. Plan for Pilots Employed by Markair, Inc.*, 293 F.3d 1139, 1145-46 (9th Cir. 2002) (same); *Hansen v. Cont'l Ins. Co.*, 940 F.2d 971, 982 (5th Cir. 1991) (same)).

MEMORANDUM DECISION AND ORDER  - 12

The Second Circuit explained the rationale behind this exception to the exhaustion requirement is to encourage plan descriptions to be written "in a manner calculated to be understood by the average plan participant," so they are "sufficiently accurate and comprehensive to reasonably apprise such participants and beneficiaries of their rights and obligations under the plan." *Kirkendall*, 707 F.3d at 180 (quoting 29 U.S.C. § 1022(a)). Exempting from the general exhaustion requirement those plan participants who "reasonably interpret" their ERISA plan not to impose an exhaustion requirement will have the effect of encouraging employers and plan administrators to clarify their plan terms, and consequently lead more employees to pursue benefits claims through their plan's claims procedure in the first instance. *Watts*, 316 F.3d at 1209.

### B.    *Analysis*

Based upon the parties' arguments and the persuasive authority from the Eleventh, Second, and Seventh Circuits, the Court finds LeCates reasonably interpreted the Plan to not require a second level of appeal.[7] The Court finds the Plan terms are ambiguous as to whether LeCates was required to pursue a second level of appeal before filing suit. Section XV begins with the language that a plan participant who "wishes" to formally appeal "*may* do so" through the process explained in Section XV. The first step in the appeal process is described in mandatory terms in subsection C(1): "[a] written appeal *must* be sent" within 180 days after receipt of notice of an Adverse Benefits Determination. Both parties agree LeCates filed the first level of appeal on July 17, 2014,

---

[7] Blue Cross refers to the process described in Section XV(C)(4) of the Plan as a "second level of appeal." Mem. at 9. (Dkt. 16-1 at 9.) Accordingly, the Court will use the same terminology; however, by doing so, the Court does not intend to imply that an additional level of appeal was required, as explained herein.

**MEMORANDUM DECISION AND ORDER - 13**

which effectively appealed the April 16, 2014 denial of his claims for benefits.[8] Blue

Cross mailed a reply dated September 2, 2014, upholding its denial of LeCates's claims

for benefits.

     In contrast, the second level appeal process is couched in discretionary language.

The Plan in Section XV(C)(4) indicates that, if the original decision is upheld, the plan

participant "may" send an additional written appeal. Elsewhere in the Plan, in the section

entitled "Rights of Plan Participants," the Plan indicates that, if the plan participant is not

satisfied with the reasons given for the denial, "you may file suit in a state or federal

court." There is no mention of a requirement to send a second appeal letter upon receipt

of the denial of benefits letter. Although the Plan in Section XV(D) indicates that a

participant "must" exhaust the internal grievance and appeal process, which includes

completing "all levels of appeal," the Court finds the Plan terms cannot reasonably be

read to require the filing of a second level appeal before a lawsuit may be filed.

     The use of language such as "may" and "should" and "wish," given their plain and

ordinary meaning, indicates a plan participant has the opportunity to participate in a

voluntary, rather than mandatory, second level review procedure. *Gallegos*, 210 F.3d at

810. Moreover, in both the section titled Rights of Plan Participants, and in the section

describing the appeal process, the second level appeal is not described as a prerequisite to

filing suit. Here, Blue Cross's September 2, 2014 letter upholding its decision on

---

[8] At the hearing, Blue Cross's counsel admitted the April 16, 2014 notice triggered the first step in the appeal process. Blue Cross provided no explanation as to the effect, if any, of the notice in the May 26, 2014 EOB, which denied benefits on the grounds the services provided were not medically necessary.

**MEMORANDUM DECISION AND ORDER  - 14**

reconsideration was reasonably understood by LeCates as terminating the internal review process.

LeCates's understanding is further supported by the granting of additional appeal rights in the September 2, 2014 letter. The letter explained "new" appeal rights would become available, and LeCates "may" submit a second appeal within 180 days from the date of the newly issued EOB. The issuance of a new EOB on September 8, 2014, the granting of an additional 180 days from the date of the newly issued EOB, and the use of discretionary language, are all contradictory to the language in the Plan in Section XV(C)(4). There, the Plan indicates that an additional written appeal "may" be sent within 60, not 180, days. The 180 day period applies, per the Plan language, to a first level appeal, which LeCates already had filed. The fact LeCates's attorney filed suit within the 180 day period[9] illustrates even he interpreted the discretionary language to mean LeCates had the opportunity to file either another appeal or a lawsuit within that 180 day time period. That LeCates's attorney was confused is not surprising. Even the Court was left scratching its figurative head upon its review of the record. On the one hand, Blue Cross seeks to hold LeCates to a mandatory second level of appeal when, on the other hand, even Blue Cross did not follow its own internal procedures and confused the issue in the September 2, 2014 letter.[10]

---

[9] 180 days from the September 8, 2014, EOB would have been Saturday, March 7, 2015. Plaintiff would have had until Monday, March 9, 2015, within which to file his appeal with Blue Cross. *LeGras v. AETNA Life Ins. Co.*, 786 F.3d 1233, 1238-39 (9th Cir. 2015) (where the 180 day time limit imposed by the plan fell on a Saturday, the court held the appeal was timely when the plaintiff mailed the appeal on the first weekday following the weekend). LeCates filed this lawsuit on March 5, 2015.

[10] LeCates, in his memorandum in opposition to Blue Cross's motion for summary judgment, interpreted the September 2, 2014 letter as "renewing the number of appeals required prior to bringing suit," creating an endless appeals process. Mem. at 4. (Dkt. 17.)

**MEMORANDUM DECISION AND ORDER  - 15**

In conjunction with the letters he received, the Court finds LeCates's interpretation of the Plan is reasonable. It is apparent that LeCates and his attorney believed they had pursued the avenues available to LeCates and concluded he could bring his claims in this Court, and needed to file a complaint within 180 days of September 8, 2014. A natural reading of the plain language of the Plan, together with the September 2, 2014 letter, is that further administrative review was optional. Nowhere does the Plan explicitly state that pursuit of both a first level and second level appeal is required before a claim may be taken to court. *See Watts*, 316 F.3d at 1209 (explaining that the failure to clearly state pursuit of administrative remedies is required before bringing suit led the claimant to reasonably conclude exhaustion was not necessary).[11]

LeCates is not barred by the exhaustion requirement from pursuing his claims in this Court.

## 2.   Motion to Strike

Before turning to the merits of the cross motions for summary judgment, the Court first will address Blue Cross's motion to strike. LeCates introduced the affidavits of D. Timothy Anstine and Josh E. Buessing, experts who explain the various testing techniques used to determine blood alcohol concentration. (Dkt. 19, 20.) Blue Cross

---

[11] The court in *Watts* noted that the discretionary language was a "simple drafting problem to remedy," suggesting that the plan under review could have contained a statement that "No action at Law or in Equity shall be brought to recover under this PLAN document until the appeal rights herein provided have been exercised and the PLAN benefits requested in such appeal have been denied in whole or in part." *Watts*, 316 F.3d at 1208 (quoting *Springer v. Wal-Mart Associates' Group Health Plan*, 908 F.3d 897, 900 (11th Cir. 1990)). The court noted also that it did not mean "to imply that the reasonableness of a claimant's interpretation is to be judged solely by the contents of the summary plan description. It may well be that interpreting the document as Watts did would not have been reasonable if the letter announcing the denial of her claim had informed her that she had to exhaust all of her administrative remedies before she could file a lawsuit. We do not have that question before us, because the denial letter Watts received did not contain that information." Similarly, the September 2, 2014 letter LeCates received did not inform LeCates he was required to pursue another level of appeal before he could file suit.

argues the evidence is improper, because in an ERISA matter, the Court and the parties are limited to an examination of the administrative record. LeCates argues Blue Cross failed to engage in any meaningful investigation, and that if it had, the information in the affidavits would have been discovered.

The Ninth Circuit adheres to the general rule that a district court may review only the administrative record when considering whether the plan administrator abused its discretion, but may admit additional evidence on de novo review. *Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 970 (9th Cir. 2006). The Court may, "in its discretion, consider evidence outside the administrative record to decide the nature, extent, and effect on the decision-making process of any conflict of interest; the decision on the merits, though, must rest on the administrative record once the conflict (if any) has been established, by extrinsic evidence or otherwise." *Id.*

Here, LeCates seeks to introduce the affidavits in support of the decision on the merits, not with respect to the effect on the decision-making process of any conflict of interest. Accordingly, the Court may not, and will not, stray from the administrative record.[12]

---

[12] The Court notes further that the information contained within the affidavits is irrelevant. At the hearing, both parties were asked whether consideration of the affidavits was integral to deciding either motion; both parties conceded it was not.

**MEMORANDUM DECISION AND ORDER - 17**

3.      **Motions for Summary Judgment**

A.      *Standard of Law*

LeCates brings his claim against Blue Cross[13] pursuant to ERISA's civil

enforcement provision. *See* 29 U.S.C. § 1132(a)(1)(B). Section 1132 provides that a

"civil action may be brought ... by a participant ... to recover benefits due to him under

the terms of his plan [or] to enforce his rights under the terms of the plan." *Id.*

Summary judgment is appropriate only when there is no genuine issue of material

fact, so that the dispute may be decided solely on legal grounds. Fed. R. Civ. P. 56. "[A]

denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a de novo

standard unless the benefit plan gives  the administrator ... discretionary authority to

determine eligibility for benefits." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101,

115 (1989). The Plan in this case gives the administrator discretion to determine

eligibility, and therefore the Court will review the decision to deny benefits for abuse of

discretion. *Id.*

But, if the plan administrator is also the funding source, or insurer, for an ERISA

plan, that conflict of interest must be weighed as a factor in determining whether there is

an abuse of discretion. *Tremain v. Bell Indus., Inc*., 196 F.3d 970, 976 (9th Cir. 1999).

*Tremain v. Bell Indus*., Inc., 196 F.3d 970, 976 (9th Cir. 1999). A conflict of interest

---

[13] The Court notes LeCates did not sue Gritman, the Plan Administrator as defined in the Plan. Blue Cross is the Contract Administrator. Neither party disputes that Blue Cross is a proper defendant here. *See Cyr v. Reliance Standard Life Ins. Co.*, 642 F.3d 1202, 1206 (9th Cir. 2011) (en banc)  (holding that defendants in actions brought under Section 1132(a)(1)(B) should not be limited to plans and plan administrators; *LifeCare Mgt. Servs. LLC v. Ins. Mgt. Adm'rs., Inc.* 703 F.3d 835, 845 (5th Cir. 2013) (where "a [Third Party Administrator] exercises control over a plan's benefits claims process, and exerts that control to deny a claim by incorrectly interpreting a plan in a way that amounts to an abuse of discretion, liability may attach," citing *Cyr*, 642 F.3d at 1207).

exists in such circumstances because, while the administrator is responsible for administering the plan so that those who deserve benefits receive them, the administrator also "has an incentive to pay as little in benefits as possible to plan participants because the less money the insurer pays out, the more money it retains in its own coffers." *Abatie v. Alta Health & Life Ins. Co*., 458 F.3d 955, 966 (9th Cir. 2006) (citation omitted).

To determine whether an administrator operates under a conflict of interest, the beneficiary must provide "material, probative evidence, beyond the mere fact of the apparent conflict, tending to show that the fiduciary's self-interest caused a breach of the administrator's fiduciary obligations to the beneficiary." *Friedrich v. Intel Corp*., 181 F.3d 1105, 1109 (9th Cir. 1999). If the beneficiary makes such a showing, the second step shifts the burden to the plan, which is then required to produce evidence showing that "the conflict of interest did not affect the decision to deny benefits." *Id*. If the plan does not meet its burden, the decision to deny benefits is reviewed de novo by the district court. *Id*.

The parties do not dispute that the abuse of discretion standard applies. However, LeCates contends a conflict of interest exists, requiring the Court to weigh the conflict as a factor in determining whether Blue Cross's decision was arbitrary and capricious. Here, Gritman is the plan administrator and the funding source, not Blue Cross. At the hearing, LeCates asserted the agreement between Gritman and Blue Cross contained a reinsurance provision, requiring Blue Cross to shoulder some portion of the funding, which in turn constitutes a conflict of interest for Blue Cross. Yet, LeCates did not point to support in

the record for that assertion, and the Court has not unearthed evidence of the existence or the terms of such an agreement.

Reviewing Gritman's role, the only evidence in the record of Gritman's involvement was Blue Cross's email to it on March 25, 2015, and Gritman's email response dated April 6, 2015. In that email, Gritman indicated it had received the materials Blue Cross sent regarding the denial of benefits and that it agreed with Blue Cross's denial of LeCates's claims. There is no evidence of bad faith or improper motivation inherent in the email exchange.

Nonetheless, where, as in this case, the Plan gives the administrator discretion, and the administrator has a conflict of interest, the Court "is instructed to judge its decision to deny benefits to evaluate whether it is reasonable." *Salomaa v. Honda Long Term Disability Plan*, 642 F.3d 666, 675 (9th Cir. 2011). *See also Stephan v. Unum Life Ins. Co. of Am.*, 697 F.3d 917, 929 (9th Cir. 2012) (quoting *Conkright v. Frommert*, 559 U.S. 506, 521 (2010)); *Day v. AT&T Disability Income Plan*, 698 F.3d 1091, 1096 (9th Cir. 2012)). Reasonableness does not mean the Court would make the same decision. *Salomaa*, 642 F.3d at 675. The Court is to judge the reasonableness of the plan administrator's decision skeptically when the administrator has a conflict of interest. *Id.* Even without such skepticism, deference to the plan administrator's judgment does not mean the Plan prevails in every case. *Id.*

The test for abuse of discretion in a factual determination is whether the Court is left with a "definite and firm conviction that a mistake has been committed," and the Court may not substitute its view for that of the fact finder. *Id.* at 676. To make that

determination, the Court considers "whether application of the correct legal standard was (1) illogical, (2) implausible, or (3) without support in inferences that may be drawn from the facts in the record." *Stephan*, 697 F.3d at 929 (internal quotation marks omitted); *Salomaa*, 642 F.3d at 676.

### B.   *Analysis*

Turning now to the Plan provision upon which Blue Cross relied in denying LeCates's claim for benefits, the Court applies contract principles derived from state law, but is guided by the policies expressed in ERISA and other federal labor laws. *Richardson v. Pension Plan of Bethlehem Steel Corp.*, 112 F.3d 982, 985 (9th Cir. 1997). The Ninth Circuit requires terms in an ERISA plan to be interpreted "'in an ordinary and popular sense as would a [person] of average intelligence and experience.'" *Gilliam v. Nevada Power Co.*, 488 F.3d 1189, 1194 (9th Cir. 2007) (quoting *Richardson v. Pension Plan of Bethlehem Steel Corp.*, 112 F.3d 982, 985 (9th Cir. 1997)). More specifically, the Ninth Circuit directs the Court to "first look to explicit language of the agreement to determine, if possible, the clear intent of the parties. The intended meaning of even the most explicit language can, of course, only be understood in the light of the context that gave rise to its inclusion." *Gilliam*, 488 F.3d at 1194 (quoting *Armistead v. Vernitron Corp.*, 944 F.2d 1287, 1293 (6th Cir. 1991)). When a plan is ambiguous, the Court is permitted to examine extrinsic evidence to determine the intent of the parties. *Id.*

Each provision in an agreement must be construed consistently with the entire document such that no provision is rendered nugatory. *Id.* But, when a plan is ambiguous, the Court must examine extrinsic evidence to determine the intent of the parties. *Id.* If,

after applying the normal principles of contractual construction, the insurance contract is fairly susceptible of two different interpretations, the rule of construction requiring the interpretation most favorable to the insured will be adopted. *Blankenship v. Liberty Life Assur. Co. of Boston*, 486 F.3d 620, 625 (9th Cir. 2007). However, the rule requiring interpretation most favorable to the insured in the event of ambiguous terms will apply except where the plan: (1) grants the administrator discretion to construe its terms, (2) is the result of a collective-bargaining agreement, or (3) is self-funded. *Blankenship*, 486 F.3d at 625. Here, because the Plan grants the administrator discretion to construe its terms, the rule does not apply and the Court must be guided by whether Blue Cross abused its discretion. *Id.*

Blue Cross argues the plain meaning of the illegal act exclusion in the Plan supports its interpretation that LeCates was engaged in an illegal act at the time of the accident. Blue Cross cites several cases which have held similar plan provisions are not ambiguous and which found that driving with more than the legal limit of blood alcohol was an illegal activity within the policy terms. For example, in *Tourdot v. Rockford Health Plans, Inc.*, 439 F.3d 351 (7th Cir. 2006), the court examined a plan provision excluding payment for medical services if the accident resulted from the commission of "any illegal act." At the time of the accident, the plaintiff's blood alcohol level measured by a Breathalyzer test showed a BAC of 0.10g/dL. A later blood test administered in the emergency room showed the plaintiff's blood-alcohol level to be 0.14 g/dL. The plaintiff was cited for inattentive driving.

**MEMORANDUM DECISION AND ORDER - 22**

Referring to Wisconsin law, Rockford Health Plans denied coverage on the basis of the illegal act exclusion. Wisconsin law in effect at that time considered a person operating a motor vehicle with a blood-alcohol concentration above .10 g/dL in violation of the law. Wis. Stat. Ann. § 885.235(1) (West 2006). The court in *Tourdot* held the illegal act provision was not ambiguous, and that the plaintiff's operation of his motorcycle while intoxicated fell within the illegal act exclusion. *Tourdot*, 439 F.3d at 354. *See also Sisters of the Third Order of St. Francis v. Swedishamerican Group Health Benefit Trust*, 901 F.2d 1369, 1372 (7th Cir. 1990) (finding an exclusion for expenses "incurred while engaged in any illegal or criminal enterprise or activity" unambiguous and that injuries sustained while drunk driving fell within the exclusion when the plaintiff was driving with more than twice the lawful level of alcohol in his blood); *Folks v. Kirk Paper Corp. Medical & Dental Ben. Plan*, 1999 WL 16326 *3 (N.D. Cal. 1999) (finding the plan did not abuse its discretion in denying the plaintiff's claim for benefits for medical expenses incurred as a result of driving while intoxicated under a plan provision excluding coverage for engaging in "an assault or other illegal act," and the plaintiff was convicted of drunk driving and vehicular manslaughter); *SGI/Argis Employee Ben. Trust Plan v. Canada Life Assur. Co.*, 151 F.Supp.2d 1044, 1048 (E.D. Ark. 2001) (finding that insured was engaged in an illegal act when an unchallenged blood alcohol test taken ninety minutes after the accident showed an alcohol level of .344%, more than three times the legal limit).

Blue Cross cites several of the above examples in support of its argument that the illegal act exclusion in the Plan is not ambiguous and the Court should uphold Blue

**MEMORANDUM DECISION AND ORDER  - 23**

Cross's interpretation of the exclusion here. However, in *Bekos v. Providence Health Plan*, 334 F.Supp.2d 1248, 1256 (D. Or. 2004), the federal district court in Oregon found the phrase, "other illegal act,"[14] when read in the context of the plan as a whole, was ambiguous because it did not specify the level of offense and it did not specify whether any official action, such as a citation, was required to trigger its application. The court held that a reasonable person could read the phrase as requiring a conviction by a governmental authority to trigger the exclusion. *Id.* LeCates argues the Court should find the illegal act exclusion here ambiguous for the same reasons the court did in *Bekos*.

The Court finds none of the cases cited by either LeCates or Blue Cross particularly persuasive as argued by the parties. The parties argue the Plan language here is either ambiguous or not ambiguous, relying upon similar plan language in the cases cited above. However, the Court finds an analysis comparing plan language and phrasing misplaced. Instead, the Court adopts the logic applied in *Tourdot* and *SGI/Argis*, based upon the definition of "alcohol concentration" under Idaho law.

Idaho law considers it unlawful for any person who is "under the influence of alcohol…or any combination of alcohol, drugs and/or any other intoxicating substances, or who has an alcohol concentration of 0.08, "as defined in subsection (4) of this section, or more, as shown by analysis of his blood, urine, or breath, to drive or be in actual physical control of a motor vehicle…." Idaho Code § 18-8004(1)(a). Subsection (4) defines what constitutes a blood alcohol concentration of .08:

---

[14] The plan excluded medical coverage for services if they: "relate to any condition sustained as a result of engagement in an illegal occupation, the commission or attempted commission of an assault or other illegal act, a civil revolution or riot, duty as a member of the armed forces of any state or country, or a war or act of war which is declared or undeclared."

**MEMORANDUM DECISION AND ORDER - 24**

an evidentiary test for alcohol concentration shall be based upon a formula of grams of alcohol per one hundred (100) cubic centimeters of blood, per two hundred ten (210) liters of breath or sixty-seven (67) milliliters of urine. Analysis of blood, urine or breath for the purpose of determining the alcohol concentration shall be performed by a laboratory operated by the Idaho state police or by a laboratory approved by the Idaho state police under the provisions of approval and certification standards to be set by that department, or by any other method approved by the Idaho state police.

Idaho Code § 18-8004(4). Persons having an alcohol concentration of less than .08 as defined in subsection (4), "as shown by analysis of his blood, urine or breath, by a test requested by a police officer shall not be prosecuted for driving under the influence of alcohol" except as provided in the statute. Idaho Code § 18-8004(2).

To meet Idaho Code § 18-8004(4)'s laboratory standards, the Idaho State Police has enacted several administrative rules governing blood collection and alcohol testing at an approved laboratory. *See* IDAPA 11.03.01.13. Specifically, any blood sample tested must contain at least 10 milligrams of sodium fluoride per cubic centimeter of blood plus an appropriate anticoagulant, and the results of an analysis on blood for alcohol concentration "shall be reported in units of grams of alcohol per one hundred (100) cubic centimeters of *whole* blood." IDAPA 11.03.01.013.02. (emphasis added.)

An in-depth review of the case law yields the realization that Idaho law is unique in its definition of "blood alcohol concentration." For example, in *Tourdot*, the court looked to state law to determine whether the term "illegal act" had a plain meaning. 439 F.3d at 354. The court held that an illegal act does have a plain meaning, in that it refers to any activity contrary to law. *Id.* The court then asked whether the plaintiff's activities fell within that classification. *Id.* Under Wisconsin law at the time, any person with a

**MEMORANDUM DECISION AND ORDER - 25**

blood-alcohol concentration above 0.10g/dL who operated a motor vehicle violated the law. Under Wisconsin law, alcohol concentration was defined simply as "the number of grams of alcohol in 100 milliliters of a person's blood or the number of grams of alcohol in 210 liters of a person's breath." Wis. Stat. Ann. § 885.235(1)(a) (West 2006). The plaintiff was administered a Breathalyzer test at the scene of the accident, indicating a BAC of 0.10g/dL. Blood was later taken at the hospital. Wisconsin law did not provide a statutory reference as to what type of blood test was required.

Similarly, in *SGI/Argis*, the court looked to Texas law regarding what constituted legal intoxication such that the illegal act exclusion in the policy would apply.[15] Similar to Wisconsin, Texas simply defined a person with an alcohol concentration of 0.1% to be legally intoxicated, and that alcohol concentration means "the number of grams of alcohol per 100 milliliters of blood." *SGI/Argis*, 151 F.Supp.2d at 1048. The plaintiff's BAC, determined by a blood test ninety minutes after the crash, was .344%. The plaintiff was not charged with or convicted of illegal activity. The court concluded the illegal act exclusion was not ambiguous, and that the insured was engaged in an illegal act at the time of the accident. *Id.* at 1049. Specifically, the court noted there was no proof attacking the credibility or reliability of the blood test; no evidence challenging the accuracy of the blood test; and, no evidence to suggest that the insured's blood alcohol level was not in excess of the legal limit at the time of the accident. *Id.* at 1048.

Here, applying the same logic as the courts in *Tourdot* and *SGI/Argis*, the Court finds the illegal act exclusion in the Plan must be read in light of Idaho law. In that

---

[15] Although the case was brought in the Eastern District of Arkansas, the accident occurred in Texas.

context, the Court finds the exclusion for expenses incurred "for the treatment of injuries sustained while…engaging in an illegal act" unambiguous, because the phrase "engaging in an illegal act" refers to acts that the Idaho legislature has deemed contrary to law. *Tourdot*, 439 F.3d at 354. A conviction is not required. *SGI/Argis*, 151 F.Supp.2d at 1048.

But, the Court finds Blue Cross abused its discretion in concluding that LeCates, under the facts present in the record, was ineligible for benefits under the illegal act exclusion. The Court recognizes Idaho considers drunken driving against the law, as does Wisconsin and Texas and every other state in the United States. But, Idaho sees fit to regulate what type of blood test can be used to support a finding of blood alcohol concentration greater than 0.08. Illegal intoxication is defined as a blood alcohol concentration of .08 grams of alcohol per 100 centimeters of *whole* blood. Further, the sample must contain at least 10 milligrams of sodium fluoride per cubic centimeter of blood plus an appropriate anticoagulant. And finally, an approved laboratory must test the blood.

The blood test conducted on LeCates does not meet the definition of unlawful activity defined by Idaho law, and therefore does not fall within the definition of illegal intoxication for the purposes of driving under the influence. Importantly, in neither *Tourdot*, *SGI/Argis*, nor any of the other cases upon which Blue Cross relies in interpreting similar illegal act exclusions in the context of driving while intoxicated, do state legislatures require a specific type of blood test. Idaho, however, has chosen to

**MEMORANDUM DECISION AND ORDER - 27**

precisely define what constitutes a blood alcohol concentration of .08 or more, and requires the blood test to be taken on whole blood, not serum blood.

The denial letter specifically stated Blue Cross relied upon the blood test results from the blood taken at the hospital as support for its conclusion LeCates was over the legal limit for blood alcohol concentration, or intoxicated, at the time of the accident. But, the blood serum test result does not meet the legal requirement to support a conclusion of illegal intoxication under Idaho law. Nonetheless, Blue Cross made its determination without any other support in the record. The facts and evidence relied upon by Blue Cross here do not adequately support the inference made by Blue Cross that LeCates was engaged in an illegal act—i.e. driving while intoxicated as defined by Idaho law.[16]

Unlike in *SGI/Argis,* LeCates was not three times over the legal limit such that an inference could be made based upon a serum blood test that LeCates met the legal requirement for a finding of intoxication under Idaho law. In fact, there is no evidence Blue Cross noted the difference, or was even aware of the difference, between test results using whole, versus serum, blood. Nor was a second, independent test, such as a breathalyzer, administered to confirm the blood test results like in *Tourdot*.

There is no evidence Blue Cross considered the facts and circumstances of the accident, which would have been contained in the police report. Blue Cross never

---

[16] Despite the Court's findings here, the Court is not implying that a serum blood test could never be used to support a determination that an insured was over the legal limit for alcohol. Both parties attempted to submit information about the difference between a blood alcohol test using serum, versus whole, blood, either by expert testimony submitted by affidavit, or case law. (*see* Dkt. 19, 20, 29.) Yet, Blue Cross's investigation, and its denial letter, makes no mention of the difference. Nor did Blue Cross consider a conversion factor, or rely upon its own medical expert to make a determination that the serum blood test could be considered equivalent to a whole blood test based upon the facts under consideration.

**MEMORANDUM DECISION AND ORDER  - 28**

requested a copy of the report.[17] Yet, even the plan administrator in *Sisters*, faced with an insured with more than twice the lawful level of alcohol in his blood, had before it its insured's plea of guilty to driving under the influence. *Sisters*, 901 F.2d at 1372 (noting that the plaintiff pleaded guilty and had a blood alcohol level of .211). Similarly, the plan administrator in *Folks* requested a copy of the police report, the contact information of the investigating officer, and court pleadings, all of which unequivocally indicated Mr. Folks was intoxicated. *Folks*, 1999 WL 16326 at *1. Additionally, Mr. Folks plead guilty to a criminal complaint, which specifically charged him with having a blood alcohol content of .13. *Id.* at n.1.

The facts in the administrative record here, considered as a whole, do not support Blue Cross's factual determination that LeCates was engaged in an illegal act. Other than the test results of one aspect of the routine metabolic panel administered in the emergency room, there is no other evidence in the record to support Blue Cross's determination LeCates was driving while intoxicated.[18] None of the physicians' notes mentioned LeCates smelled of alcohol or was incoherent due to intoxication at the time of admission. To the contrary, the physical exam notes indicate LeCates was able to answer the physician's questions, described his primary complaint as a right sided headache and pain, denied suffering from chest pain, denied neck pain, and he was "very

---

[17] The police report is not in the record, but it was alluded to by Plaintiff's counsel in Plaintiff's memorandum in support of his motion for summary judgment. (Dkt. 23-1 at 3) ("[A]bsent from the record are facts that the first officer to the scene believed alcohol was a factor in the accident….Instead, the record is clear where the officer's report stated affirmatively that alcohol was not a factor in the accident and Plaintiff was only issued a traffic citation for failure to maintain a lane."). The report is not in the record, and assertions and representations by counsel contained within the brief do not satisfy Fed. R. Civ. P. 56(c).

[18] That LeCates had been drinking is undisputed. But, for Blue Cross to deny benefits under the illegal act exclusion, there must be more evidence of the nature discussed herein.

alert, oriented x3 and could provide a history." (Dkt. 16-4 at 4-5.) Additional medical notes indicated: "this is an awake male…oriented to person and place. Speech is appropriate." (Dkt. 16-4 at 7.) Under the facts, it appears Blue Cross ignored evidence in LeCates's favor, and inconsistent with engaging in an "illegal act" under Idaho law.

When it comes to driving under the influence as defined under Idaho law, "illegal" must be proven by evidence beyond a reasonable doubt. While the Court does not necessarily find that such an evidentiary standard applies to Blue Cross, the sole piece of evidence or fact relied upon here is not even indisputable. Yet, Blue Cross ascribes "illegal" to the circumstances under which LeCates was driving his motorcycle without any definitive facts or evidence that would comport with Idaho law, or with the types of other, corroborating evidence considered by the plan administrators in *Sisters*, *Folks*, *Tourdot*, and *SGI/Argis*. In other words, Blue Cross must have more before it ascribes the moniker "illegal" to its insured's conduct and denies benefits on that basis.[19]

In this respect, it is worth noting that Blue Cross appears not to have followed its own review process. The review process indicates that, after receipt of the written appeal, "all facts, including those originally used in making the initial decision and any additional information that is sent *or that is otherwise relevant*, will be reviewed…." (emphasis added.) Yet Blue Cross failed to request the police report, which undoubtedly would have been relevant. Instead, Blue Cross seized solely upon the serum blood test performed as a

---

[19] At the hearing, Blue Cross attempted to change course and argued it could have denied LeCates's claim under the illegal act exclusion on the grounds LeCates was speeding at 70 miles per hour at the time of the accident. However, the administrative record consists of what the insurer had when it denied the claim. Blue Cross had no evidence LeCates was speeding---it did not have evidence of the applicable speed limit or any traffic citation charging LeCates with traveling at excessive speed. Further, the denial letter made no mention of LeCates's speeding. Blue Cross's additional arguments therefore have not been considered.

**MEMORANDUM DECISION AND ORDER - 30**

matter of course upon LeCates's admission to the emergency room. Even in other cases where the insured was clearly intoxicated, the plan administrator requested outside information, such as court pleadings and police reports.[20]

The evidence Blue Cross had before it is not the type of substantial, reliable evidence indicating LeCates was engaged in an illegal act under Idaho law at the time he suffered his injuries. Instead, the evidence in the administrative record here is in contrast to the overwhelmingly strong evidence of illegal intoxication in *Tourdot* and *SGI/Argis*, as well as in the other cases cited by Blue Cross. Accordingly, the Court finds Blue Cross's determination does not rest upon sufficient facts to support the inference it made, and therefore constitutes an abuse of discretion. Based upon the evidence of record as a whole, the Court is left with the firm conviction that a mistake was committed in this case.

---

[20] Perhaps that information could have been reviewed had Blue Cross made it clear that, under a second level appeal, such evidence would be requested and considered. In other words, had Blue Cross's appeals process been more understandable and less ambiguous, as discussed herein, LeCates would have been asked to submit additional information, such as the police report.

**MEMORANDUM DECISION AND ORDER - 31**

## CONCLUSION

Having considered all of the circumstances of this case and the evidence in the administrative record, the Court concludes Blue Cross abused its discretion in denying LeCates's claim for medical benefits. Blue Cross's denial of benefits relied solely upon a blood test administered at the hospital which would not have supported a finding of illegal intoxication absent other, more compelling indicators of LeCates's level of intoxication at the time of the accident. Further, Blue Cross failed to obtain a copy of the police report, and did not consider other evidence in the record in LeCates's favor, which included the physicians' reports of LeCates's demeanor upon admission to the hospital. The appropriate remedy is for the Plan to provide LeCates with medical benefits.

## ORDER

**NOW THEREFORE IT IS HEREBY ORDERED:**

1)    Defendant's Motion for Summary Judgment (Dkt. 16) is **DENIED**.

2)    Defendant's Motion to Strike Affidavits (Dkt. 22) is **GRANTED**.

3)    Plaintiff's Motion for Summary Judgment (Dkt. 23) is **GRANTED.**

4)    The parties are to meet and confer, and submit a proposed judgment consistent with the Court's Order by **September 23, 2016.**

DATED: September 16, 2016

Honorable Candy W. Dale
United States Magistrate Judge